Frank S. McCullough, J.
This is a proceeding pursuant to articles 77 and 78 of the CPLR which seeks an order removing and surcharging certain trustees of a union welfare fund and for other relief.
The proceeding arises out of a labor-management dispute involving an organization known as the Carpenters and Suppliers Association of Rockland County (herein designated as the Association) made up for the most part of builders in the area who normally employed carpenters, and Local 964 of the Carpenters Union (herein designated as the Union). As a result of collective bargaining agreements certain trusts were established for the welfare and benefit of Union members. The funds set up by these agreements will hereafter be referred to as Plan A. The last agreement between the parties with reference to Plan A was entered into on July 1, 1963, and was to terminate on June 30, 1968.
The administration of Plan A was set up so that there were three Union trustees and three management trustees. Shortly after the plan was set up the respondent Campbell, who was a Union trustee, was also designated as the administrator of the fund. The record does not indicate that any of the trustees had any experience or background in the handling and investment of trust funds.
In 1965 and 1966 differences arose between management and labor and a “new” association was formed which was named the Rockland County Carpentry Contractors Association. The Union negotiated the same type of agreements for trust funds *108 with the new organization; those agreements will hereafter he referred to as Plan B. The respondent Campbell was also designated as the administrator of the funds under Plan B.
Shortly after Plan B was negotiated the petitioners brought this proceeding. Specifically, petitioners allege that the respondents, and particularly the respondent Campbell,, have not properly handled the trust funds placed in their care, that they had made improper investments and have placed in Fund B certain moneys that should have been placed in Fund A.
The court held many hearings spaced over a considerable period of time.
The various agreements that set up Plan A (as well as Plan B) purport to give the trustees absolute and complete freedom to handle these funds in any manner they see fit, and in addition to a general denial of any improper conduct, the respondents rely upon the purported right to handle the funds as they saw fit.
When the funds were first set up it appears that the moneys paid in were deposited in various bank accounts in Rockland County and other neighboring counties. Then in 1966 and 1967 the respondent Campbell placed certain funds in certificates of deposit and in State of Israel bonds. The latter transaction was carried out with a certain amount of publicity in the press. The evidence adduced at the trial indicated that these investments were made solely on the decision of the respondent Campbell and without any consultation with the other trustees.
By the time of these investments, relations between the contracting parties had become extremely strained, and it is clear from the evidence that the respondents determined that they would prefer an association of contractors more amenable to their viewpoint, and as a result, the Rockland County Contractors Association came into being. Its membership consisted, in many instances, of builders and contractors who had previously been members of the Association. The moving parties in the formation are not clearly defined, but the conduct of the Union, headed by the respondent Campbell, in bargaining with members of the new group to set up Plan B, resulted in a complaint by the Association to the National Labor Relations Board. After extended hearings, the hearing examiner, by decision dated September 17, 1969, determined that the Union, among other things, had engaged in unfair labor practices, and in .substance had attempted to coerce various contractors by insisting that this litigation be abandoned as the price of entering into a contract.
*109 The evidence further discloses that with regard to Plan B, unbusinesslike procedures were followed. Contributions were supposed to start coming in to the Plan B funds beginning in January of 1967. A clerical employee of the Union testified that around May of 1967 the then counsel for the Union visited their office and casually questioned them about contributions to Plan B. He asked to see the books on the new fund and expressed surprise when told that there were none. He directed them to immediately set up a new set of books, but apparently neither he, nor any of the respondents, took any further action to straighten out the amounts to be allocated to the separate funds, or to instruct the employees as to how these books were to be set up. The office employees, on their own, then set up the books, figured out the amounts that should have gone into Plan B, and simply diverted that amount from subsequent Plan A contributions until that sum was realized.
Although counsel originally requested the court to take jurisdiction and hear and determine this matter, it would seem that counsel for the respondents had second thoughts about this question of jurisdiction.
On September 30, 1968, when a hearing was scheduled in the courthouse in White Plains, New York, a substantial portion of the membership of Local 964 of the Union appeared in the courtroom, with the obvious intention of influencing the court. Counsel for the respondents attempted to justify their appearance by stating variously, that he had no control of the Union members; that these men had appeared voluntarily because Campbell had been falsely accused of improper conduct, and on the other hand, that he intended to use them as witnesses, even though petitioners had not yet finished their case.
Still later, in September of 1969, counsel for the respondents brought on a motion in the United District Court for the Southern District of New York seeking to remove this proceeding to that court. In granting a motion by the petitioners to remand the action to this court, Mr. Justice Sylvester Ryan said, in part: “ The absence of good faith in Respondents’ maneuvering is evident from the fact that they took no appeal from Justice McCullough’s decision but, on September 23, 1969, the day before they filed the petition for removal to this Court and the day which had been set for the presentation of evidence of their defense, they requested an adjournment of the continuance of the trial ostensibly for the purpose of obtaining a ‘ hostile ’ witness from the State Insurance Department (at the close of the argument, the ‘ necessary witnesses ’ had multiplied in number to 1 thirty or forty’). Not surprisingly, *110 Respondents failed to appear on the adjourned date, and did not bother to inform the Court of their intention not to appear although here again counsel lays the blame on someone other than himself. Counsel’s conduct was characterized by the Court ‘ as a calculated affront ’ to it.”.
In spite of such conduct this court has evaluated this case on the evidence, bearing in mind that not only are millions of dollars involved, but the future welfare of several hundred individual working men as well.
The court remarked on several occasions during the trial that the method of administering these trust funds was basically wrong from its inception. The handling and investment of large sums of money were placed in the hands of men who were completely inexperienced in the field and whose outlook was influenced by an adversary attitude and who apparently did not spend the amount of time necessary to properly handle the funds. Professional investment people, trained and specializing in the investment and reinvestment of large sums of money were neither consulted nor retained. Both management and union trustees have the duty to protect employees with pension fund rights against improper investments and conflict of interest on the part of administrators of these funds.
The court finds on the evidence that petitioners are not entitled to a surcharge as against respondents for funds allegedly not properly deposited in the trust funds.
On the other hand, the evidence is overwhelming that the respondents have completely failed in their obligation as trustees and by their actions have jeopardized the future welfare of the members of their own Union, the beneficiaries of the trust funds. Other than a gratuitous statement by the respondent Kearsey that no member of the Local would be ‘ ‘ caught short ’ ’ by the switch from Plan A to Plan B, all of the evidence, particularly that presented by the State Insurance Department auditor, is that the funds accumulated in Plan A will be liquidated and returned to the members on a pro rata basis, with no future benefits to be realized. The court is, therefore, of the opinion that the respondents should be removed as trustees, and further that they should account for all sums received under the new trust (Plan B), to the extent of contributions received for members of Local 964 who were covered under Plan A so that there shall be no loss of benefits by those individuals.
Submit proposed judgment in accordance with the foregoing, providing for the removal of the Union trustees, an accounting of funds received, and an award for expenses and counsel fees to the petitioners.